UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JULIANA HENSLER,

Plaintiff,

vs.

CITY OF O'FALLON, ILLINOIS,

Defendant.                                                         Case No. 09-cv-268-DRH-PMF

MEMORANDUM AND ORDER

HERNDON, Chief Judge:

## I. Introduction and Procedural History

On April 8, 2009, plaintiff Juliana Hensler filed a two-count complaint against defendant City of O'Fallon, Illinois, under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Doc. 2). Generally, plaintiff alleged defendant discriminated and retaliated against her based on her fibromyalgia and chronic fatigue syndrome during her employment as a part-time dispatcher. The case proceeded to bench trial in this Court on September 4, 2012. At the close of trial on September 5, 2012, the Court orally ruled in favor of defendant. Thus, the Court directed defendant to provide the Court with proposed findings of fact and conclusions of law. Having heard the evidence in the case, reviewed defendant's proposed findings and conclusions, and in accordance with FEDERAL RULE OF CIVIL PROCEDURE 52, the Court finds and concludes as follows.

## II. Findings of Fact

1. City of O'Fallon, Illinois, is a local governmental entity.

2. Plaintiff, Juliana Hensler, was employed by O'Fallon as a dispatcher from 2002 until October 2007.

3. On March 30, 2007, while employed at O'Fallon, Hensler filed a charge of discrimination under the ADA with the Equal Employment Opportunity Commission (EEOC).

4. On April 25, 2007, while employed at O'Fallon, Hensler filed a charge of discrimination with the Illinois Department of Human Rights (IDHR).

5. On January 15, 2008, after her employment with O'Fallon ended, Hensler filed a charge of retaliation with the IDHR.

6. On January 7, 2009, Hensler's claims with the EEOC and IDHR were dismissed and she was issued a right to sue letter.

7. Hensler filed this action on April 8, 2009 (Doc. 2).

8. Hensler stated in her complaint that this Court's jurisdiction is based upon 28 U.S.C. § 1331.

9. Venue in this Court is based upon 28 U.S.C. § 1391 as O'Fallon is located in this state and district, and all acts complained of took place in this state and district.

10. The first count of her complaint, which alleged disability discrimination on the basis of Hensler's alleged fibromyalgia and chronic fatigue syndrome, was dismissed on summary judgment. (Doc. 41).

11. The second count of the complaint alleged retaliation under the ADA. This count survived O'Fallon's motion for summary judgment. (Doc. 41).

12. Hensler's complaint sought an array of damages including compensatory and punitive damages. On January 31, 2012, the Court denied Hensler's motion to reconsider grant of summary

judgment and granted O'Fallon's motion to strike plaintiff's jury demand and to exclude compensatory and punitive damages (Doc. 58).

13. Hensler claims to have fibromyalgia and chronic fatigue syndrome.

14. Prior to her employment at O'Fallon, Hensler worked with Chief Betten at Fairview Heights where Hensler was a dispatcher and Betten was a patrol sergeant.

15. While at Fairview Heights, Betten asked Hensler to check on an unknown car at a business and based on her failure to provide the requested information, the Fairview Heights police made contact with an employee of the business at gunpoint. Based on her handling of that call, Betten formed an opinion that Hensler was difficult to work with.

16. During her employment at O'Fallon, Betten spoke with Hensler about her inflexibility with scheduling.

17. In 2005, the Public Safety department restructured the work hours of dispatchers so that a part-time dispatcher would typically work eight hours alongside two full-time dispatchers who each worked twelve hours. Management's intent was that if a full-time dispatcher called in sick, then the part-time dispatcher would only have to work an additional 4 hours to cover for the full-time employee's absence.

18. At the time this change was implemented in 2005, Hensler submitted a note from her doctor that she would be able to work an occasional twelve hour shift. The Court finds that this constitutes a change in Hensler's representation of her alleged disability to her own convenience, as it relates to how much she wanted to work. This was the first instance that will repeat itself later as the evidence will reveal.

19. O'Fallon valued part-time dispatchers who had the flexibility to fill in during extra shifts and work when full-time employees were on vacation or sick.

20. On September 23, 2006, Hensler's supervisor was Terry McFarland. On that day, a dispatcher called in sick. Hensler was working that evening but was scheduled to get off before the other dispatcher's shift would have ended.

21. McFarland called Hensler and asked her if she would be willing to stay over and cover for the sick dispatcher. The conversation between McFarland and Hensler was recorded. In the call, Hensler repeatedly asked if she would get paid overtime or get extra compensation even though she would not be working over 40 hours that week. Notably, Hensler did not once make mention of a physical infirmity.

22. McFarland was frustrated with Hensler's behavior during the call and complained to Betten and Captain Scott Battoe about Hensler's request for extra compensation. Both Betten and Battoe were critical of Hensler's refusal to help out on September 23, 2006.

23. On November 30, 2006, Hensler was scheduled to work the evening shift. A major snowstorm was developing that night. Hensler requested permission from a supervising police officer to go home early due to the weather. As she believed she had been given permission to leave as soon as an additional dispatcher arrived at 7:00, Hensler went home at 7:30 p.m., without speaking to her supervisor.

24. The following day, Hensler learned that right after she left, the Public Safety Department received a high volume of calls for assistance and Hensler was accused of abandoning her shift. Hensler also learned that the supervising police officer believed that when he gave her permission to leave early, he thought that she was going to leave at midnight, closer to her end time.

25. Betten, Battoe, and McFarland all learned that Hensler left early on November 30, 2006 and were unhappy with her performance.

26. As a result of these problems with Hensler, management chose to remove Hensler from the schedule for January 2007 and relieve Hensler from working her remaining shifts at the end of December 2006.

27. At the time that management made this decision, they believed that Hensler was technically skilled but did not like her approach to the job.

28. The evidence is undisputed that the relevant decision-makers were not satisfied with Hensler's job performance and attitude prior to Hensler filing her charges of discrimination.

29. After management removed Hensler from the January 2007 schedule, Hensler applied for unemployment benefits.

30. After learning from unemployment that she may not be eligible for benefits because of her restricted work schedule, Hensler obtained a note from her physician indicating that she was able to work twelve hour shifts. Similar to the prior instance, the Court finds this evidence constitutes Hensler changing her representations to her employer concerning her alleged disability to meet her perceived needs. In this instance, if the Court believed Hensler was disabled, it would also find she defrauded the Illinois Department of Employment Security.

31. In response to her claim for unemployment, Betten determined that Hensler should be put back on the schedule for February 2007 and given the minimum number of hours necessary for the city to avoid paying unemployment benefits to Hensler.

32. Following her return, Hensler asked to be considered for full-time employment. On February 13, 2007, Hensler sent an email to McFarland and Captain Battoe indicating that she wanted to be notified of any full-time dispatch position openings. When she was not selected for a full-time position in March 2007, Hensler filed her first charge of discrimination on March 30, 2007.

33. Management in O'Fallon did not like Hensler for quite some time before she filed her initial charge of discrimination.

34. Management did not like Hensler's style as an employee before she filed her charges of discrimination.

35. In April 2007, a full-time dispatcher position opened up. The position was not publically announced. After discussions with Chief Betten and McFarland, Captain Battoe hired Valerie Hancock for the position. Hancock had previously worked as a part-time dispatcher of O'Fallon. Hensler was not considered for this position.

36. During this time frame, Hancock told Battoe that Hensler had suggested to her that if Hensler was successful in her charges of discrimination against O'Fallon, she would be getting the full-time dispatcher position offered to Hancock. Hancock was upset during her conversation with Battoe.

37. Battoe in turn spoke with Hensler about what she said to Hancock. Hensler told Battoe that her conversations with co-workers were private. Battoe asked Hensler not to express opinions that he believed were specifically intended to upset and invoke a response from another employee.

38. In October 2007, Hensler participated in an interview process for a full-time dispatcher position. Hensler was not selected for the position.

39. After learning that she was not selected for the full-time position, Hensler resigned.

40. It is possible that going into the October 2007 interview, people believed that Hensler would not come out as the top candidate. However, they wanted to give her the chance and Hensler failed.

41. At the time of her interview, the relevant decision-makers, Chief John Betten, Captain Scott Battoe, and to a lesser degree, April Mitchell, perceived that Hensler was not a team player.

42. Management's decision to not select Hensler for open full-time dispatcher positions and their perception that Hensler was not a team player were not based on Hensler's filing discrimination or retaliation claims.

43. Management's perceptions were based on Hensler's September 23, 2006 phone conversation with Terry McFarland, because she left early during a snow storm on November 30, 2006, and because of her confrontation with Valerie Hancock, regardless of what the actual facts of that confrontation were.

44. The relevant decision-makers in O'Fallon also viewed Hensler as inflexible, regardless of the various times she volunteered to work. When they called her to work extra shifts, she did not always respond to the call.

45. Hensler's testimony was very inconsistent with respect to her disability. The Court finds invalid her disability claims on the basis of her lack of credibility.

46. The Court finds the testimony of the O'Fallon witnesses to be very credible.

47. The Court finds the testimony of April Mitchell to be credible when she said that she directed the decision-makers not to take the discrimination claims into account and the Court believes the testimony of Captain Battoe and Chief Betten when they both said that they did not take the discrimination charges into account when they made the decision.

48. Any preconceived notions that decision-makers had about Hensler's anticipated performance in the October 2007 interview were not related to her discrimination charges. Any such preconceived notions were due to their perceptions that she was not a team player and based on other issues having to do with matters other than her discrimination claims.

### III. Conclusions of Law

1. The Court expressly notes that all of the above stated findings of fact were relied in relation to its conclusions of law.

2. O'Fallon is an employer within the definition of the ADA. 42 U.S.C. § 12111(5)(A).

3. This Court has jurisdiction based upon 28 U.S.C. § 1331.

4. Venue is proper in this Court as O'Fallon is located in this state and district and all acts complained of took place in this state and district. 28 U.S.C. § 1391.

5. The Americans with Disabilities Act, 42 U.S.C. § 12203, prohibits retaliation and provides as follows:

   a) Retaliation

> No person shall discriminate against any individual because such individual opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

6. At the stage of trial, the *McDonnell Douglas* analysis "drops from the case . . . and the factual inquiry proceeds to a new level of specificity." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15, 103 S. Ct. 1478 (1983).

7. In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 244-45, 258, 109 S. Ct. 1775 (1989), the Court's majority held that an employer is not liable under Title VII for a mixed-motive employment decision where it would have made the same decision even if the illegal factor had played no role in its decision-making. The Seventh Circuit has applied the principles in *Price Waterhouse* to cases brought under the ADA. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 959 (7th Cir. 2010).

8. A plaintiff claiming retaliation in violation of Title VII is not entitled to the remedies set forth in 42 U.S.C. § 2000e-5(g)(2)(B). *McNutt v. Bd. of Trustees of U. of Ill.*, 141 F.3d 706, 709 (7th Cir. 1998).

9. In order to recover any relief in a Title VII claim based on retaliation, a plaintiff must "establish that that alleged discrimination was the 'but for' cause of a disputed employment action." *Id.*

10. The ADA's statutory prohibition of retaliation, 42 U.S.C. § 12203(a), contains language comparable to Title VII, 42 U.S.C. § 2000e-3(a). Consequently, the Seventh Circuit looks to Title VII retaliation cases for guidance in assessing ADA retaliation claims. *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998).

11. To satisfy her burden of proof, Hensler had the burden to prove by a preponderance of the evidence that her filing one or more charges of discrimination with the EEOC or IDHR was the "but-for" cause of O'Fallon not selecting her for the open positions. Hensler could not meet her burden of persuasion by simply offering evidence that her charges of discrimination were one of a number of factors considered by O'Fallon in deciding to offer the full-time positions to other candidates instead of her.

12. As the court noted in *Palmquist v. Shinseki*, "an alleged retaliator's mindset is relevant to proving the causation element of a retaliation claim." 808 F. Supp. 2d 322, 341 (D. Me. 2011), *aff'd*, 689 F.3d 66 (1st Cir. 2012).

13. Hensler's charges of discrimination were not the "but for" cause of O'Fallon not selecting her for the open positions.

14. There is nothing in the record from which the Court infers that the decision-makers relied on Hensler's discrimination charges in not giving her a full-time job.

15. There is no evidence at all that suggests that there has been any discrimination based on Hensler's disability claims.

16. Hensler was not constructively discharged.

## IV.   Conclusion

The Court finds in favor of defendant City of O'Fallon, Illinois and against plaintiff Juliana Hensler. The Clerk is instructed to enter judgment accordingly.

**IT IS SO ORDERED.**

Signed this 25th day of October, 2012.

Digitally signed by David R. Herndon
Date: 2012.10.25 13:28:07 -05'00'

**Chief Judge
United States District Court**